UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HEATHER MILLS,

          Plaintiff,

                                        Case Number 11-13148-BC
v.                                      Honorable Thomas L. Ludington

UNITED PRODUCERS, INC.,

          Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant United Producers, Inc., is a middleman in the livestock industry.  Prior to the events giving rise to this litigation, Plaintiff Heather Mills was employed as the office manager of Defendant's facility in St. Louis, Michigan.

Defendant's business model is not particularly complicated, so far as the allegations in this case are concerned.  Farmers present their cattle to Defendant.  It inspects the cattle and sorts them into three categories.  Healthy cows are accepted.  Unhealthy cows are not.  Cows of questionable health are conditionally accepted.  Defendant promptly pays farmers for the healthy cows, but does not pay for the cows of questionable health.  Defendant then sends the cows to the slaughterhouse, where a U.S. Department of Agriculture veterinarian inspects each cow.  If the cow is deemed fit for human consumption, the slaughterhouse pays Defendant.  If the cow is condemned, the slaughterhouse does not.  Defendant, in turn, then pays the farmer for the conditionally accepted cows that have passed inspection.  At least that is how the business is supposed to operate.

One of Defendant's managers, Scott Acker, decided to alter the operations to reduce Defendant's risk at the farmers' expense. He did so by altering U.S.D.A. condemnation slips. When a cow that Defendant had unconditionally accepted as healthy was condemned by the U.S.D.A., Mr. Acker would white out its tag number on the condemnation slip. In its place, he would insert the tag number of a conditionally accepted cow that had passed inspection, misrepresenting that the conditionally accepted cow had been condemned. When Plaintiff learned of this conduct, she reported it to her supervisors. Colloquially, she blew the whistle.[1] Defendant responded, Plaintiff alleges, by terminating her employment. This case ensued.

In July 2011, Plaintiff brought suit in this Court. ECF No. 1. In March 2012, Plaintiff sought leave to file an amended complaint. ECF No. 15. The motion was granted. ECF No. 19. The amended complaint asserts three claims. ECF No. 20. Count one alleges that Defendant violated Michigan public policy by terminating Plaintiff's employment because of "her failure or refusal to violate federal and/or Michigan law." Am. Compl. ¶ 79, ECF No. 20. Count two alleges that the "open door policy" contained in Defendant's handbook creates an implied contract term under the rule announced in *Toussaint v. Blue Cross and Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980) and that Defendant breached this implied term. Count three alleges that Defendant breached the "whistleblower policy" that Defendant enacted in 2008.

Defendant now moves for summary judgment on the three counts and, alternatively, for partial summary judgment on damages. ECF No. 30. For reasons detailed below, the motion will be granted in part and denied in part. Briefly, Defendant is entitled to summary judgment on count one because Michigan does not recognize "a 'public policy' cause of action for an

---

[1] As an aside, it should be noted that Plaintiff did not "blow the whistle" within the meaning of Michigan's Whistleblower's Protection Act, Mich. Comp. Laws § 15.361 et seq. That statute "provides protection for two types of 'whistleblowers': (1) those who report, or are about to report, violations of law, regulation, or rule to a public body, and (2) those who are requested by a public body to participate in an investigation held by that public body or in a court action." *Henry v. City of Detroit*, 594 N.W.2d 107, 110 (Mich. Ct. App. 1999).

employee who is discharged for reporting violations of law to a superior." *Cushman-Lagerstrom v. Citizens Ins. Co. of America*, 72 F. App'x 322, 328 (6th Cir. 2003). Defendant is entitled to summary judgment on count two because the handbook's open door policy does not create enforceable contractual rights — Plaintiff, for example, signed an acknowledgement agreeing that the handbook "is not intended to serve as a written contract of employment and should not be interpreted as such." Def.'s Mot. Summ. J. Ex. 7. Defendant is not entitled to summary judgment on count three, however, because the separate whistleblower policy contains no such contract disclaimer. On the contrary, the policy expressly promises that employees will not be discharged for reporting illegal or fraudulent activity. And Defendant does not contest that there is evidence suggesting that Plaintiff was discharged for her whistleblowing. Finally, Defendant is not entitled to partial summary judgment on its after-acquired evidence defense (that it would have terminated Plaintiff's employment if Defendant had known Plaintiff's time cards were inaccurate) because Defendant did not plead the defense in the answer. Moreover, a question of fact exists regarding whether Defendant would have in fact terminated Plaintiff's employment because of Plaintiff's alleged misconduct.

## I

## A

Defendant is a middleman in the livestock industry. Headquartered in Columbus, Ohio, Defendant operates facilities across the Midwest. On April 7, 2006, Plaintiff began working as the office manager of Defendant's facility in St. Louis, Michigan. Pl. Dep. 14:6, Feb. 20, 2012, *attached as* Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 1. An hourly employee, Plaintiff recounts "I was hired in on a full-time basis with the understanding that the minimum requirement was 32 hours. Overtime would be available." Pl. Dep. 13:14–16.

While Defendant's business model, as noted, is straightforward (so far as the allegations in this case are concerned), its organizational structure is not. For example, Defendant did not clearly define who Plaintiff's immediate supervisor was. Plaintiff asserts that Craig Emery, the St. Louis facilities manager, was her supervisor since he directed her work on a day-to-day basis. Pl.'s Br. 4 & n.7; Pl. Dep. 116:4, 122:12–13; *see also* Emery Dep. 7:12–18, Jan. 20, 2012 (acknowledging that he could direct Plaintiff's work), *attached as* Pl.'s Resp. Ex. 5; Martin Dep. 38:24–39:1, May 9, 2012, *attached as* Pl.'s Resp. Ex. 4 (acknowledging that Mr. Acker "had an indirect supervisory role"). Defendant asserts that Plaintiff's immediate supervisor was Deborah Stump, one of Defendant's regional office managers. Def.'s Br. Supp. Mot. Summ. J. 8; *see* Stump Dep. 22:7–12, Feb. 15, 2012, *attached as* Pl.'s Resp. Ex. 7. And Plaintiff's accusations of malfeasance focus on a third middle-manager, Scott Acker. Charged with overseeing Defendant's four facilities in Michigan (including the St. Louis facility), Mr. Acker explains: "[E]ach facility has their own branch manager and they report to me. And I just work to make sure that everything's functioning fine and properly at the branches." Acker Dep. 6:21–24, Jan. 20, 2012, *attached as* Pl.'s Resp. Ex. 13.

**B**

An employee handbook was issued to Plaintiff when she began working for Defendant. On April 14, 2006, Plaintiff signed an employee handbook "acknowledgement." *See* Def.'s Mot. Ex. 7. The acknowledgement disclaims that the handbook creates an enforceable "written contract of employment," providing:

> This Employee handbook has been prepared to provide information concerning the rules, policies, and general operating procedures of United Producers, Inc. This handbook is not intended to serve as a written contract of employment and should not be interpreted as such. In addition, the policies stated herein are subject to revision by United Producers, Inc. at any time.

> By signing this acknowledgement, you indicate that you have received a copy of the Employee Handbook.  You also indicate that you understand that you are employed at will and that either you or United Producers may terminate the employment relationship at any time for any reason.  No representative of United Producers, Inc., other than the CEO, has the authority to enter into an agreement with you that is contrary to the foregoing.

Def.'s Mot. Ex. 7.  Three provisions of the handbook are at issue in this case.  The first is the

"timekeeping" provision, which provides:

> Federal and state laws require UPI to keep an accurate record of time worked in order to calculate employee pay and benefits.  Time worked is all the time actually spent on the job performing assigned duties. . . .
>
> Accurately recording time worked is the responsibility of every non-exempt employee . . . .
>
> Altering, falsifying, tampering with time records, or recording time on another employee's time record may result in disciplinary action, up to and including termination of employment.

Def.'s Mot. Ex. 4, at 4.  The second is the handbook's "open door policy," which provides:

> Management wants to hear your concerns, questions and comments for improving the overall company and its operations.  Open door means that any level of management in UPI will be happy to talk with you at your request. . . .
>
> All questions and concerns will be handled as promptly as possible and in as confidential a manner as possible.  Information will be disclosed only on a need-to-know basis for the purpose of resolving the issue.  This policy prohibits retaliation against employees who bring a question or concern to management pursuant to this policy.

*Id*. at 3.  And the third is a "no-call no-show" policy, which provides that an employee who is

absent for three consecutive days without notifying the employee's supervisor automatically

resigns."  *See* Pl.'s Resp. Ex. 12, at 2 (Stump timeline).

## C

In March 2008, Defendant enacted a "whistleblower policy."  *See* Pl.'s Resp. Ex. 9.  The

policy is expressly authorized by Defendant's CEO, Dennis Bolling.  It bears not only his name,

but also his office phone number, his home phone number, and his cell phone number.  The

policy provides:

> A whistleblower, as defined by this policy, is an employee of United Producers
> Inc. who reports an activity that he/she considers to be illegal or dishonest to one
> or more of the parties specified in this Policy.  The whistleblower is not
> responsible for investigating the activity or for determining fault or corrective
> measures;   appropriate   management   officials   are   charged   with   these
> responsibilities.
>
> Examples of illegal or dishonest activities are violations of federal, state or local
> laws; billing for services not performed or for goods not delivered; and other
> fraudulent financial reporting.
>
> Whistleblower protections are provided in two important areas — confidentiality
> and  against  retaliation.    Insofar  as  possible,  the  confidentiality  of  the
> whistleblower will be maintained.  However, identity may have to be disclosed to
> conduct a thorough investigation, to comply with the law and to provide accused
> individuals with their legal rights of defense.  The Company will not retaliate
> against a whistleblower.  This includes, but is not limited to, protection from
> retaliation in the form of an adverse employment action such as termination . . . .
>
> If an employee has knowledge of, or a concern of, illegal or dishonest fraudulent
> activity, the employee is to contact his/her immediate supervisor or one of the
> managers below.

Pl.'s Resp. Ex. 9.  Plaintiff signed an acknowledgement of receipt of this policy in April 2008,

two years after she had signed an acknowledgement of receipt of the handbook.

## D

One part of Defendant's business, as noted, is acting as a middleman for farmers wishing

to sell their cattle to slaughterhouses.

When farmers send cattle to Defendant each Tuesday, Defendant's salespeople sort the

cows into three categories.  Acker Dep. 11:24–25.  Those in the first category, cows appearing fit

for human consumption, are accepted by Defendant and paid for.  Acker Dep. 12:11–14.  Those

in the second category, cows appearing unfit for human consumption, are rejected.  Schuler Dep.

8:4–8, Jan. 20, 2012, *attached as* Pl.'s Resp. Ex. 18.  And those in the third category, cows

appearing generally healthy but with some risk of being found unfit, are conditionally accepted.
Acker Dep. 12:25–14:9.  That is, Defendant accepts the cows from the farmer, but conditions
payment on the cow passing inspection by the U.S. Department of Agriculture.  Cows in this
category are labeled "subject" (presumably since the farmer's right to payment on the cow is
subject to government approval of the cow).  In Mr. Acker's words:

> A subject animal — what a subject animal represents is an animal that may or
> may not pass inspection, which means inspected by a U.S.D.A. inspector, um, and
> they will say that they're either fit for human consumption or not fit for human
> consumption.  If they are not fit for human consumption it's called condemned,
> and we will not be paid anything for that animal.  So animals that we — they have
> a chance of being condemned for various reasons may be marked subject.

Acker Dep. 14:5–9.  When an animal is condemned by the government inspector, Mr. Acker
further explains, "We get a — it will show it on the kill sheet that there was no value to that
animal.  And frequently, we get what we call a condemnation slip. . . .  It's something the
U.S.D.A. inspector puts together."  Acker Dep. 15:5–10.

A "kill sheet," Mr. Acker explains, is a document produced by the slaughterhouse that
"shows what the animal's — they normally show a carcass price and what, how much the
animal's paid."  Acker Dep. 10:8–11.  That is, a kill sheet is essentially a bill of sale from
Defendant's transaction with the slaughterhouse.  It enumerates how much the slaughterhouse
paid Defendant for each cow that passed inspection.

A "condemnation slip" is a form (specifically, U.S.D.A. Food Safety and Inspection
Service Form 6000-13) produced by the government veterinarian.  Plaintiff explains: "The
condemnation slips are signed directly by the inspecting veterinarian that's there at the kill floor
or at the packing house.  If the animal is condemned, it lists the identification number of the
animal [i.e., its "tag number"] and in the main body of [the condemnation slip] it will list the
reason for the condemnation."  Pl. Dep. 115:3–7.

"Those sheets," Mr. Acker reports, "normally are copied and we've chose, we choose to send them on to the farmer. . . .  The office manager [such as Plaintiff] would be the one mailing them."  Acker Dep. 15:13–16.

**E**

In 2009, Plaintiff discovered that Mr. Acker was altering the condemnation slips that he received from the government inspector before giving them to Plaintiff to mail to the farmers. Asked in her deposition to detail what she discovered, Plaintiff responded: "When the condemnation slips would come in with the kill sheets, animals that had passed inspection, Scott was not paying the farmers back.  He was changing tag numbers on the condemnation slips and telling farmers that their stock had been condemned when, in fact, it had not been."  Pl. Dep. 21:1–6.

Specifically, Mr. Acker was whiting out tag numbers of condemned animals and replacing them with tag numbers of "subject" cows that had passed the government inspection. "It was random at first," Plaintiff recalls, "and in 2010 it became much more significant."  Pl. Dep. 21:14–15.  Asked how many times she found Mr. Acker altering the condemnation slips, Plaintiff responded: "Eight, ten."  Pl. Dep. 23:19.

Mr. Acker explains that he thought of his actions not as a fraud on the farmers, but merely as a "net transaction," elaborating: "The animal that was marked subject may have actually passed [government] inspection, but one of the other ones that did not pass inspection, so we netted it out."  Acker Dep. 17:23, 18:15–18.

Mr. Acker illustrated his thinking with a hypothetical: "[Say the farmer] brought ten in, we paid him for nine at the time.  I had one animal marked on a subject basis — [then], when the kill sheets came back showing that [a different animal was condemned], we would pass the sheet

on to him [showing] one condemned animal.  If nine — he brought ten in, nine passed, he did get paid for nine animals."  Acker Dep. 18:6–12.  The farmers, Mr. Acker acknowledges, were not notified of this "net transaction."[2]

When Plaintiff discovered what Mr. Acker was doing, she first brought the matter to Mr. Emery.  "I showed him the condemnation slip and asked him why does this not match up to the kill sheet," Plaintiff recalls.  Pl. Dep. 23:1–2.  She further expressed concern "[t]hat this animal has, in fact, been paid for, it did pass inspection, and I have a payout sheet that shows I am to send a letter to the farmer stating that this animal has been condemned."  Pl. Dep. 23:2–5.  Mr. Emery "said he would look into it."  Pl. Dep. 23:7.

Plaintiff also brought the matter to Ms. Stump, recalling: "That would have been in the fall of 2009.  It would have been also during 2010. . . .  I told her that I had concerns . . . .  And I did not — did not feel that it was right to send farmers letters that their stock had been condemned when it had not been, and I refused to do so."  Pl. Dep. 24:1–11.

Both Mr. Emery and Ms. Stump confirm that Plaintiff brought her concerns to them.  Emery Dep. 10: 12–20; Stump Dep. 31:1–4.  Mr. Emery investigated the issue by speaking with Mr. Acker.  Emery Dep. 12:25–13:14.  Based on the conversation, Mr. Emery concluded that Mr. Acker was not altering condemnation sheets.  Emery Dep.13:11–14.  Mr. Emery did not investigate further.

Ms. Stump conducted essentially the same investigation — she spoke to Mr. Acker.  When Ms. Stump was asked in her deposition "did you do anything to investigate at all?" she

---

[2] Substantively, the net transaction was treating a purchase contract like it was an option contract.  When a cow passed Defendant's inspection as healthy, the cow was purchased and the farmer was paid.  When a cow passed as "subject," Defendant took an option to purchase the subject cow, and would exercise the option if the cow passed the government inspection.  Without telling the farmer, however, Mr. Acker decided to impose an undisclosed additional term with his net transaction procedure.  To be paid on a subject cow, not only must it pass inspection, but all the healthy cows must also pass inspection.  Thus, instead of Defendant's option being pegged to an individual subject cow, it was tied to the entire herd.  Effectively, of course, this reduced Defendant's costs at the farmer's expense.

responded: "To the best that I can recall, I did speak with [Mr. Acker] . . . .  But honestly, I don't

remember the conversation much other than that."  Stump Dep. 34:7–13.  In her deposition, Ms.

Stump was asked, "So basically your investigation of Mr. Acker was a phone call to him in

which you can't really recall what was said, true?"  Stump Dep. 36:2–4.  "True," Ms. Stump

responded.   Stump Dep. 36:5.  When questioned further, she acknowledged that she did not

comply with Defendant's whistleblower policy:

> Q:  [I]n this case you went directly to the person that was allegedly doing the
> wrongdoing, Mr. Acker, and told him what my client did, did you not?  Or
> what my client said?
> A:  Yes, I did.
> Q:  So would you agree with me that that would be a breach of the confidentiality
> provisions [of the whistleblower policy]?
> A:  Possibly. . . .
> Q:  And you've already [testified] under oath that you were the plaintiff's
> supervisor.  True?
> A:  Yes.
> Q:  So was it that you just simply were unaware of this policy and what it required
> you to do?
> A:  I guess so.  I —
> Q:  If you would have known what you were supposed to do, would you have . . . ?
> A:  Yes.
> Q:  Why would you have done that?
> A:  Because it says I should.  Our policy says I should.  I do try and follow our
> policies.

Stump Dep. 45:16–23, 46:20–47:15.

Mr. Acker denies that either Ms. Stump or Mr. Emery spoke with him about Plaintiff's

concerns, asserting "I did not hear anything about it."  Acker Dep. 58:9–10.

**F**

In March 2010, Plaintiff travelled to the corporate headquarters in Ohio.  There, she met

with Brad Warner, Defendant's corporate controller and assistant treasurer.  "I had several issues

that I wanted to, again, speak with [Ms. Stump] about," Plaintiff recalls, continuing: "but she was

unable to be there.  So I went through those issues with Brad."  Pl. Dep. 31:8–10.

**1**

The first issue regarded Defendant's dairy salespeople creating dummy accounts to circumvent company credit policies.  Specifically, Plaintiff complained that two salesmen were selling dairy cows to farmers with delinquent accounts and creating "fictitious invoices" to conceal the transactions.  Pl. Dep. 32:4–35:18, 117:3–5.

Asked to detail what she discovered, Plaintiff explained that Defendant had an "accounts receivable policy where invoices are not to be out for more than seven days."  Pl. Dep. 117:9–13. Farmers with bills outstanding for more than seven days were placed on an "accounts receivable" or "do not charge" list.  Pl. Dep.  32:13–18, 37:9–10.  "If there was a farm that was on the accounts receivable or do not charge list," Plaintiff recalled, "I was faxed a copy before each sale took place at the dairy division, that I was to take with me to go over with [our salesmen].  They would often just crumple it up, throw it in the trash, disregard it and they would create inventory numbers to get around farmers being on account receivable."  Pl. Dep. 32:22–33:3.  That is, they "were creating fictitious invoices for customers under [Defendant's] inventory into the actual customer names, loading cattle and sending them to farms."  Pl. Dep. 117:3–5.

Discussing why she brought her concern to Mr. Warner, Plaintiff continued: "The dairy animals were going to the farms, the farmer was milking that — selling the milk, and [Defendant] is holding the inventory because the farmer never billed out. . . .  [The farmer] never had to pay for the animal. . . .  But it went to that local farmer's facility, because [our salesmen] were buying for them under the fictitious names."  Pl. Dep. 34:7–14, 35:17–18.  Plaintiff also notified Ms. Stump, Mr. Acker, and Mr. Emery about her concerns.  Pl. Dep. 36:10.

The dairy salesmen were not disciplined for their actions.  *See* Kreeger Dep. 35:7–19, Feb. 13, 2012, *attached as* Pl.'s Resp. Ex 6.

**2**

The second issue raised by Plaintiff in her trip to corporate headquarters regarded insurance fraud by Mr. Acker.  Pl. Dep. 26:16–29:21.  Plaintiff recalls that she raised "one particular incident where the animal was not injured.  It would not have been a claim under transit insurance.  It was a sick animal."  Pl. Dep. 27:4–8.  She elaborates:

> It was a Monday sale.  I received a panicked phone call in the front office from one of the workers out back that a farmer was . . . trying to offload an animal that was sick and down, which, by State regulations, is not allowed.  If an animal is down and cannot offload by itself, it is not supposed to be unloaded.  It is supposed to be euthanized.  The farmer insisted on trying to drag the animal off the trailer.  I went up to the auction ring.  It was during the fat cattle sale.  I told Scott [Acker] that we had an issue out back that he needed to go.  He refused, so I went out back, got the night manager, Skip Koubek, and he and I went out back, looked at the animal. . . .
>
> It was laying on its side, oozing pus and other fluids. . . .  [I]t was [obvious] that it was sick.  It was not injured in transit.  It did not have any broken limbs.  The farmer asked if it would be covered under insurance.  I told him that no, insurance only covers for in-transit injuries, that it does not cover an animal that is sick.  So the farmer, myself and Skip Koubek all came into the office.  By this time, Scott was in there.  Scott talked with the farmer for a little while, came out and told me to go ahead and file an answer claim anyway.  And I told him I refused; I would not do that.

Pl. Dep. 27:11–28:18.

**G**

In the fall of 2010, Plaintiff again took issue with Mr. Acker's accounting practices.  Specifically, she objected that Mr. Acker was "trying to recoup fees from farmers [for condemned cattle] without them being aware of it."  Pl. Dep. 25:1–2.  She explains that "when I went into the folder to get the payouts for that week, I noticed that . . . there were a series of farmers' names that were on this list at two different sides, and he was deducting either trucking or dead stock fees from farms without them knowing it."  Pl. Dep. 11:16–23.  Discussing a

spreadsheet that Mr. Acker created to keep track of the costs that he sought to pass on to the

farmers, Plaintiff elaborates:

> This is a — what Scott has done is he's generated a list of the farm names and
> associated fees. It would either be a dead stock or a condemnation fee that was
> assessed from the kill floor or the packing house at the time that the animal was
> processed. He wrote down a dollar amount or value associated with what was
> taken out of the check that was received from the animals being slaughtered. . . .

> The slaughter facility would send a net check with all these fees taken out of it for
> the condemnations or the debts. Scott would then transfer it to a handwritten
> sheet of paper, keeping track of what farms were assessed fees. And on
> subsequent check when they would bring in cattle, he would then increase the
> deduct amount to try and recoup the fees that [Defendant] was assessed for their
> dead stock or condemned animals, not telling the farmer that he was, in fact,
> charging them and passing along that fee.

Pl. Dep. 119:17–120:10. On discovering Mr. Acker's spreadsheet, Plaintiff recalls, "I made a

copy of the sheet. I immediately went into Craig Emery's office and showed [it] to him." Pl.

Dep. 12:1–2.

Mr. Emery confirms that Plaintiff brought the matter to his attention, reporting: "I saw a

list with farmers' names, various amounts." Emery Dep. 11:18–19. Again, Mr. Emery

investigated by talking to Mr. Acker. Emery Dep. 11:21–12:1. Mr. Acker explained to Mr.

Emery that Defendant is "charged X amount if you have a dead animal on a truck and you get

charged 40, 50 dollars trucking even though it's dead. So if that cow didn't pass inspection,

there's no way for us to recover those funds. [And so Mr. Acker] just did it on a later cow."

Emery Dep. 11:21–12:1. Mr. Emery concluded that Mr. Acker's actions were "appropriate."

Emery Dep. 12:4–10.

Plaintiff also reported her concerns to Ms. Stump. "Again," Plaintiff recalls, Ms. Stump

said "she would look into it." Pl. Dep. 25:13. Again, Ms. Stump recalls that she spoke with Mr.

Acker.  Stump Dep. 34:6–13.  And again, Ms. Stump explained in her deposition, "honestly, I don't remember the conversation."  Stump Dep. 34:6–13.

## H

Plaintiff won two awards for job performance in 2010.  First, Defendant gave Plaintiff a "Shining Star" award for her "[e]xemplary performance."  Stump Dep. 33:20.  Additionally, Plaintiff won a cash award for placing first in Defendant's "Producers Advantage Program."  *See* Pl.'s Resp. Ex 25.

## I

In March 2011, Plaintiff took a three-day vacation to Florida.  Pl. Dep. 79:24–80:4.  The following month, she again vacationed in Florida.  Pl. Dep. 80:5–9.  On this trip, she also tried out a new job.  "Mr. Schenk," Plaintiff recounts, "who is one of the cattle buyers through United Producers, had asked me if I was — or would be interested in a possible position with him. . . . Because of his age he needed somebody who would help him with grocery shopping, help him with his dogs, drive him to and from Florida each year."  Pl. Dep. 80:15–17, 80:24–81:2. Plaintiff purchased a one-way plane ticket from Flint, Michigan to Florida, planning to drive back to Michigan with Mr. Schenk.  Pl. Dep. 81:12–17.

On Tuesday, April 12, 2011, Mr. Emery drove Plaintiff to the airport in Flint.  Pl. Dep.92:21–93:2.  Plaintiff recalls that Ms. Stump "called on the way to the airport. . . .  I gave her an estimated time when we would be returning.  Because we were driving home, I did not know what the weather conditions would be, but told her that I would be back by the 1st of May."  Pl. Dep. 81:20, 82:4–7.

Over the next two weeks, Plaintiff made several calls to the office, recalling: "I would always check in with Samantha [Jensen, the office assistant,] to see how things were going.  I

received an email from John Riley when I had checked my emails about some [accounts receivable] questions that I responded to, which was on or about the 20th or the 21st of April."

Pl. Dep. 93:9–14.  On Monday, April 25, Plaintiff again called the office.  She recounts:

> I spoke with [Mr. Emery] . . . .  I told him that [Mr. Schenk] did not want to leave
> to drive back from Florida yet because it was still fairly cold here in Michigan,
> and had asked him if it was going to be a problem if I was going to be back later
> than the 1st of May.  I told him that I thought that I would be out of vacation time,
> but was not sure.  That I was okay if I did not get paid for a couple days, but I did
> not know what the requirements were, if I were going to be off, you know,
> without receiving pay, so that's what I had asked him, if he could check into that
> for me . . . .
>
> [I] asked him if I were to take this position [with Mr. Schenk] what would the
> requirements be, because before I had went down, I had asked him to talk to [Ms.
> Stump] to see if it would be possible for me to stay on even as a part-time
> employee . . . .  And if I was going to be, you know, leaving employment, for two
> weeks['] notice.

Pl. Dep. 83:5–6, 83:20–84:5, 84:8–15.  Counsel for Defendant inquired "And what did Craig say when you said 'Would it be a problem if I didn't get back later than the 1st of May?'"  Pl. Dep. 84:16–17.  "He said 'Don't worry about it.  Have fun.  Enjoy the weather.  It's much warmer down there than it is here.'" Pl. Dep. 84:18–19.

Mr. Emery recalls the conversation differently.  "Heather had called me on, I think it was a Monday when she couldn't make it back and she asked me, 'Am I just done or do I have to give two weeks' notice?'  And I said, 'I don't know, but I can call and find out.'"  Emery Dep. 23:4–8.

Mr. Emery further recalls that he called Ms. Stump the next day and relayed Plaintiff's questions.  Emery Dep. 23:10.  Ms. Stump told Mr. Emery: "I don't know, but I'll find out.'"  Emery Dep. 23:10.  Probing into this conversation in Mr. Emery's deposition, counsel for Plaintiff asked:

> Q: All right.  After you spoke to Ms. Stump on Tuesday and posed the question
> "Does she [have] to give two weeks or can she just be done" [and] she says, "I
> don't know.  I'll find out" when do you hear from her next?
> A: I think Wednesday morning.
> Q: What happens Wednesday morning?
> A: She asked me if I talked to Heather.  I said, "No."  And she told me the three
> day no-show, no-call thing and that she'd call Heather in the morning and take
> care of it. . . .
> Q: Do you call Ms. Mills on Wednesday and tell her that there is a concern that
> she is going to be a no-call, no show for three days?
> A: I did not.
> Q: Why?
> A: I was told not to.
> Q: By who?
> A: [Ms. Stump].
> Q: Did she tell you why she didn't want you to call her?
> A: Not specifically.  Other — the only thing I remember is she said, "I was tired
> of her lies."  That's the only thing specific that I can really remember.

Emery Dep. 30:11–31:13.  "Her exact words to me," Mr. Emery recounts, "if I'm remembering

correctly, was she was tired of the lies and that if Heather didn't call for three days, show up, that

they were going to let her go."  Emery Dep. 22:17–20.  Counsel for Plaintiff inquired further:

> Q: So you left it with Ms. Mills awaiting a call back from you about the answer
> to the question, correct?
> A: Yes.
> Q: And then Ms. Stump tells [you] not to inform Ms. Mills about the three day
> no-call no-show rule, right?
> A: She just specifically asked me not to call or talk to Heather for, until Thursday
> morning.
> Q: Did Ms. Mills have any reason to believe, based on what you know, that she
> was being deemed a no-call no-show?
> A: No.

Emery Dep. 31:14–31:13.

Ms. Stump recalls that after speaking with Mr. Emery, she called Plaintiff on both

Tuesday, April 26, and Wednesday, April 27.  Stump Dep. 18:17–18.  (Plaintiff denies that Ms.

Stump called either day.  Pl. Dep. 82:15–19.)  Counsel for Plaintiff inquired of Ms. Stump:

> Q: Why were you calling the plaintiff on the 26th?
> A: I needed to know what her plans were.  She hadn't contacted me.

Q: But she had contacted Mr. Emery.
A: Mr. Emery's not her supervisor. . . .
Q: Who did she take orders from on a day-to-day basis?
A: On a day-to-day basis she works closely with the facilities people.
Q: Mr. Emery?
A: Mr. Emery.
Q: So Mr. Emery in fact was the person she called on Monday, the 25th.
A: Yes.
Q: Are you saying it was inappropriate for her to call Mr. Emery?
A: No.

Stump Dep. 22:2–24; *cf.* Emery Dep. 8:7–10 ("Q: Did my client ever ask you if she could take vacation?  A: Heather sometimes I guess made me aware that she was going to be gone.").

On April 27, Ms. Stump emailed Defendant's head of human resources, Judy Martin, and Defendant's corporate controller and assistant treasurer, Brad Warner.  Pl.'s Resp. Ex. 8.  "I have a situation at the St Louis, MI branch with Heather Mills," Ms. Stump wrote, continuing:  "To the best of my knowledge, she currently has 12 hours vacation left. . . .  I personally would like to pay her this week the 12 hours of vacation and terminate her, however, I need your opinion on this." *Id*.

Ms. Martin responded by speaking with Ms. Stump and Mr. Emery.  Martin Dep. 23:1–26:17.  Ms. Martin recalls that she was informed by Ms. Stump that Plaintiff "had not returned from vacation when she said she would and that she had never even had the vacation even approved through [Ms. Stump]."  Martin Dep. 23:6–8.  Ms. Martin further recalls that she was informed by Mr. Emery that he had spoken with Plaintiff, who "called up and said that she wanted to be gone yet another week longer than what she had planned, and I asked him and what did you say to her, and he said, you know, basically he can't approve that, and she — she did not come back to work anyway."  Martin Dep. 24:24–25:3.

Mr. Warner also spoke with Ms. Stump and Mr. Emery.  Warner Dep. 16:4–12.  "[Ms. Stump] told me that Heather had not returned from vacation," Mr. Warner recalls.  Warner Dep.

16:13–14.  Mr. Emery evidently told Mr. Warner something similar, although the content of this conversation is not contained in the record.  *See* Warner Dep. 18:2–12 (emailing Mr. Emery on April 29, Mr. Warner wrote: "Obviously, Heather is claiming that you authorized additional vacation this week, which is not lining up with what you discussed with [Ms. Stump] and me").

**J**

About 11:30 am on April 28, Ms. Stump and Mr. Warner called Plaintiff and notified her that her employment had been terminated.  Pl.'s Resp. Ex. 19 (personnel action form); *see* Pl. Dep. 82:11–12 (noting that she received voicemail).  That day, Defendants also mailed a registered letter to Plaintiff's home.  Pl.'s Resp. Ex. 20.  Post-dated April 29, the letter provided: "As of this date, you have been absent from work since Monday, April 25, 2011.  Because your absence has not been approved and we have not heard from you, we have determined that you have abandoned your position.  In accordance with our policy on job abandonment, we are terminating your employment."  *Id.*

**K**

Samantha Jensen was then promoted to office manager of the St. Louis facility.  Schuler Dep. 23:14–15.  Discussing the marked differences in management styles, one of Defendant's salesmen, Mr. Schuler, explains:

> A: [Plaintiff was] very good at making sure that everything that went on [at the St. Louis facility] was to be run through the handbook so there was never confrontation.  But she would always, she would always question things that did happen.
> Q: Were you worried that that may have motivated [the] termination?
> A:  No.  I had not reason.  I knew no reason why she would have been terminated. . . .
> Q: Were you aware that Ms. Mills took any concerns to the corporate office?
> A: Yeah. . . .
> Q: Did you tell anyone else what you learned from her about what she was going to take to corporate?
> A: No.  I'm pretty sure everybody knew.

Q: Why do you say that?
A: She doesn't hold back.
Q: Who replaced my client?
A: Sam Jensen.
Q: Has Sam Jensen taken any issues to [the] corporate office that you are aware of?
A: Not that I know of.
Q: Has she brought any issues of inappropriate business conduct to your attention?
A: No.
Q: Do you believe [Plaintiff's] termination was fair?
A: No.

Schuler Dep. 21:10–18, 22:16–18, 23:9–23.

## L

In July 2011, Plaintiff brought suit against Defendant in this Court. ECF No. 1. Count one of her two-count complaint asserted a claim for breach of Michigan public policy. Count two asserted a claim for breach of Defendant's open door policy.

## M

In August 2011, Defendant's chief financial officer, Joseph Werstak, requested that Mr. Acker "send any information [he] had pertaining to Heather Mills['] employment" to human resources. *See* Pl.'s Resp. Ex. 26 (Acker email).

Mr. Acker then emailed Defendant's head of human resources, Ms. Martin, and attached a spreadsheet containing "a log of hours that had concerned me for some time." *Id*. He explained: "We were well aware of the fact that Heather had been turning in more hours to payroll than she actually worked. I had reported this to Brad Warner and Debbie Stump. The challenge in this matter was the fact that Heather would come in at many 'off business' hours to do her bookwork. In addition, many times during business hours we would not be in the office (due to making farm calls) to verify that she was actually there." *Id*. He continued: "I fully understand that this could be a very difficult issue to prove. The only pieces of evidence that I

can offer at this point of time are time cards.  When Heather started she went and purchased an electronic time card clock that is hooked up to her computer.  She could go in and change the hours on hers or anyone else's time card."  *Id*.

When Plaintiff was asked in her deposition whether anyone had expressed concern about the accuracy of her time cards, she asserted that no one had raised the issue with her.  Pl.'s Dep. 87:16–88:10.  Counsel for Defendant inquired:  "[Mr. Acker] never had any discussions with you about your not keeping to a regular schedule at the office?"  Pl.'s Dep. 106:6–8.  "No," Plaintiff responded, elaborating: "St. Louis was a very, I'd call it, lax facility when it comes to regular hours because they're generally — you work when you need to get work done.  I mean our sale days can run anywhere from eight hours to 14 to 16 hour days.  I was asked to go train in Cass City, clerk in Cass City, go down to Manchester, again taking on additional responsibilities with [accounts receivable], Small Claims, which most of those were, again, on Monday mornings when I would have to go down to court for Small Claims."  Pl.'s Dep. 106:9–17.

**N**

About this time, Mr. Acker also contacted Defendant's senior vice president of livestock marketing, Jeffrey Harding.  Acker Dep. 33:13–25.  Mr. Acker disclosed the complaints that Plaintiff had made about Mr. Acker's accounting practices.  Acker Dep. 33:22–34:1.  Mr. Harding investigated by talking to Messrs. Acker, Emery, and Schuler.  Harding Dep. 21:12–22:2, Feb. 20, 2012, *attached as* Pl.'s Resp. Ex. 16.  "I had a face-to-face with all of the, with all three of them," Mr. Harding recalls.  Harding Dep. 14–15.  The result was one refund and three disciplinary letters.

First, Defendant issued a refund T & H Dairy for $3,252.16 on September 1, 2011.  *See* Pl.'s Resp. Ex 15.  "We have conducted an in house review of transactions and reconstructed

transactions with information from the packer," the letter accompanying the refund explained, continuing: "As a result, we are not completely confident that on a few transactions, you were compensated 100% correctly for cows sold as 'subject cows.'" *Id.*

The same day, Mr. Harding issued disciplinary letters to Messrs. Acker, Emery, and Schuler. *See* Pl.'s Resp. Ex. 24. "This letter is to notify of a disciplinary action taken as a result of questions which have come to light regarding transactions with 'subject' cows marketed by T & H Dairy," the letter began. *Id.* It continued: "After reviewing the transactions, it is my conclusion that it is at least 'uncertain' whether codes of conduct for doing business were followed. As a result, UPI's reputation for doing business with high standards of honesty and integrity could be put at risk. For the above reasons, you will be placed on a six month probationary period. . . . A copy of this letter will be put in your employment record." *Id.*

## O

In March 2012, Plaintiff moved for leave to amend the complaint to add a claim for breach of Defendant's whistleblower policy. ECF No. 15. Defendant opposed the motion, arguing the proposed amendment was futile because the parties had an at-will employment relationship. In support, Defendant relied on the handbook acknowledgement that notified Plaintiff "you are employed at will and that either you or United Producers may terminate the employment relationship at any time for any reason. No representative of United Producers, Inc., other than the CEO, has the authority to enter into an agreement with you that is contrary to the foregoing." Def.'s Mot. Ex. 7.

The Court granted Plaintiff's motion, explaining the handbook prospectively limits modifications; only those approved by Defendant's CEO will be enforceable. The whistleblower policy, enacted two years after Plaintiff signed the handbook acknowledgement, is expressly

authorized by Defendant's CEO, Dennis Bolling.  In pertinent part, the whistleblower policy provides: "The Company will not retaliate against a whistleblower.  This includes, but is not limited to, protection from retaliation in the form of an adverse employment action."  Pl.'s Resp. Ex. 9.  Thus, whistleblower policy effectively modifies the "at-will" employment term, providing that Defendant may not terminate Plaintiff's employment in retaliation for reporting "illegal" or "fraudulent activity."  Restated, Defendant may terminate Plaintiff's employment for any reason, except as retaliation for reporting illegal or fraudulent activity.

## P

About this time, Plaintiff was deposed.  Afterwards, Defendant "subpoenaed records from the two health clubs she admitted she used during the time she was employed."  Def.'s Br. 10.  On May 16, 2012, the health clubs responded.  *Id.* at 11.  "The information they provided," Defendant writes, "proves irrefutably that during the time the Plaintiff was clocked in as 'working,' she was actually spending time clocked in at the health club."  *Id.* at 10.  In support of this conclusion, Defendant has produced a summary that it compiled comparing the times Plaintiff clocked into work with the times she clocked into work out at the two health clubs. Def.'s Mot. Ex. 3.  (Defendant does not produce the underlying evidence used to compile the summary.)  Defendant further produces an affidavit of Mr. Warner that asserts that if "[Defendant] had been able to prove the Plaintiff's time card fraud prior to April 29, 2012, it would have terminated her immediately."  Warner Aff. ¶ 8, *attached as* Def.'s Mot. Ex. 5.

## Q

In June 2012, Defendant moved for summary judgment.  Defendant asserts that it is entitled to judgment as a matter of law on each of Plaintiff's three claims.  Alternatively, Defendant asserts that it is entitled to partial summary judgment based on after-acquired

evidence that, if discovered while Plaintiff was still employed by Defendant, would have led to her discharge.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

## III

### A

Count one of the amended complaint asserts a Michigan public policy claim. Specifically, count one asserts that the Defendant violated Michigan public policy by terminating Plaintiff's employment because of "her failure or refusal to violate federal and/or Michigan law." Am. Compl. ¶ 79.

"Generally," the Michigan Supreme Court instructs, "and under Michigan law by presumption, employment relationships are terminable at the will of either party. *Lytle v. Malady*, 579 N.W.2d 906, 910 (Mich. 1998) (citing *Lynas v. Maxwell Farms*, 273 N.W. 315 (Mich. 1937)). Nevertheless, the Michigan Supreme Court has created "an exception to this rule

when the grounds for termination violate public policy." *Morrison v. B. Braun Medical Inc.*, 663 F.3d 251, 256 (6th Cir. 2011) (citing *Suchodolski v. Mich. Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982) (per curiam)).

More precisely, the Michigan Supreme Court has created not one, but three "public policy" exceptions to the default rule that an employment relationship is at-will. *Suchodolski*, 316 N.W.2d at 711–12; *see Humenny v. Genex Corp.*, 390 F.3d 901, 907 (6th Cir. 2004) (enumerating public policy exceptions under Michigan law); *see generally* Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 Yale L.J. 87 *passim* (1989) (discussing contract default rules).

First, a termination violates public policy when it conflicts with one of the "explicit legislative statements prohibiting the discharge, discipline, or other adverse treatment of employees who act in accordance with a statutory right or duty." *Suchodolski*, 316 N.W.2d at 711. Second, a termination violates public policy when "the alleged reason for the discharge of the employee was the failure or refusal to violate a law in the course of employment." *Id*. And third, a termination violates public policy "when the reason for a discharge was the employee's exercise of a right conferred by a well-established legislative enactment." *Id*. at 712.[3]

In this case, Plaintiff alleges that her termination violates the second exception. In her words, her employment was terminated because of "her failure or refusal to violate federal and/or Michigan law." Am. Compl. ¶ 79.

To bring a claim under this exception, a plaintiff must establish that her employer asked her to violate the law, that she refused, and that her refusal was one of the reasons that her

---

[3] These three exceptions, the Michigan Supreme Court observes, are "examples" of permissible public policy claims, not a comprehensive list. *McNeil v. Charlevoix Cnty.*, 772 N.W.2d 18, 24 (Mich. 2009). Nevertheless, the court cautions, any other proposed public policy claim must be "consistent" with them. *Id*.

employer terminated the plaintiff's employment. *See Silberstein v. Pro-Golf of Am.*, 750 N.W.2d 615, 621–23 (Mich. Ct. App. 2008).

In *Pratt v. Brown Machine Co*., 855 F.2d 1225 (6th Cir. 1988), for example, an employee's wife received a number of obscene, threatening telephone calls over eighteen months: "Some of them demanded sex; others threatened rape." *Id*. at 1228. The employee alerted the state police, who conducted an investigation. *Id*. at 1229. Although the police suspected the calls were coming from the employee's workplace, they were unable to determine the caller's identity. *Id*. at 1229 & n.1. Later, at a company picnic, the employee recognized the caller's voice when an upper-level manager said grace over the public address system. *Id*. at 1229. Back at work, the employee confronted the manager, who denied making the calls. *Id*. Following the confrontation, the employee's supervisor told the employee to "take some time off until things settled down." *Id*. at 1230. When the employee sought to return to work, the company imposed several conditions, including that the employee apologize to the manager and agree to drop the investigation into the calls. *Id*. at 1231. When the employee refused, his employment was terminated. *Id*. Several months later, the employee asked for his job back. *Id*. The employer agreed, if the employee would agree to drop the investigation into the calls. *Id*. (The employer also acknowledged that the manager who the employee had suspected was in fact the caller. *Id*.) The employee refused and instead brought a claim for violation of Michigan public policy. A jury found for the employee. *Id*. at 1232. The Sixth Circuit affirmed the judgment, explaining:

> The court rightly found that the compounding statute [Mich. Comp. Laws § 750.149], read in conjunction with the aiding and abetting statute [Mich. Comp. Laws § 767.39], provided "sufficient legislative expression" of a policy that prohibits an employer from conditioning employment upon the employee's agreement to conceal or stifle an investigation into a crime. . . .

It is sufficient that the company requested the plaintiff to drop his investigation into criminal wrongdoing, and terminated him for his refusal to do so.

*Id.* at 1237.  In reaching the decision, the court relied on *Trombetta v. Detroit, Toledo & Ironton Railroad Co.*, 265 N.W.2d 385 (Mich. Ct. App. 1978).

In *Trombetta*, the Michigan Court of Appeals instructed that terminating an employee because the employee refused to fraudulently alter pollution reports submitted to the state would violate public policy.  265 N.W.2d at 388.  The court of appeals nevertheless affirmed the trial court's grant of summary judgment to the employer because the employee offered no evidence that he was discharged because of his refusal to alter the reports.  *Id.* at 389.  (Rather, the undisputed evidence showed that the employer took the adverse employment action because of the employee's "insubordination."  *Id.* at 386.)

In this case, unlike in *Pratt*, Defendant did not request that Plaintiff drop an investigation into wrongdoing.  Rather, when Plaintiff brought her concerns to Defendant, it listened.  Specifically, Mr. Emery listened to Plaintiff's concerns and investigated them.  Ms. Stump listened to Plaintiff's concerns and investigated them.  And Mr. Warner listened to Plaintiff's concerns and investigated them.  Although the investigations were not particularly vigorous (and did not preserve the confidentiality promised to Plaintiff), there is no evidence that Defendant attempted to stifle Plaintiff's complaints, much less conditioned her employment on her agreeing to drop them.  Plaintiff has offered no evidence suggesting that she was asked to conceal her complaints about Mr. Acker's actions, for example, much less asked to participate in or help conceal the actions themselves.  In sum, like in *Trombetta*, Plaintiff has offered no evidence that she was discharged for refusing to conceal violations of the law, much less violate the law herself.  More simply, Plaintiff has not established causation.  Defendant is entitled to summary judgment on count one of the amended complaint.

Against this conclusion, Plaintiff asserts that "a causal connection is established by Stump's statement regarding Plaintiff's termination that she was 'tired of all her lies.' This statement is direct evidence that Plaintiff's termination was because she reported concerns as set forth above." Pl.'s Resp. 19.

Plaintiff is correct that Ms. Stump's statement is indirect evidence that Defendant terminated Plaintiff's employment because of her complaints about Mr. Acker's conduct. This evidence, however, does not support her public policy claim — Michigan does not recognize "a 'public policy' cause of action for an employee who is discharged for reporting violations of law to a superior." *Cushman-Lagerstrom v. Citizens Ins. Co. of America*, 72 F. App'x 322, 328 (6th Cir. 2003). Put differently, Michigan's public policy exceptions do not include a "cause of action for discharge in retaliation for internal reporting of violations of law." *Goldfaden v. Wyeth Labs., Inc.*, No. 10–1799, 2012 WL 1676664, at *6 (6th Cir. May 12, 2012) (unpublished op.) (citing *Cushman-Lagerstrom*); *see also Whiting v. Allstate Ins. Co.*, No. 08–12991, 2010 WL 956030, at *7 (E.D. Mich. Mar. 15, 2010) (Cohn, J.) ("[T]here is no precedent suggesting that an employer would be liable for terminating an employee who makes internal complaints.").

Defendant is entitled to summary judgment on count one of the amended complaint.

**B**

Count two of the amended complaint alleges that the "open door policy" contained in the handbook creates an implied contract term under the rule announced in *Toussaint v. Blue Cross and Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980). Count two further alleges that Defendant breached this implied term by terminating Plaintiff's employment because of her complaints.

Michigan law presumes, as noted, that "employment relationships are terminable at the will of either party." *Lytle v. Malady*, 579 N.W.2d 906, 910 (Mich. 1998) (citing *Lynas v. Maxwell Farms*, 273 N.W. 315 (Mich. 1937)).  To rebut the presumption of at-will employment, a plaintiff must establish either a "contract provision for a definite term of employment, or one that forbids discharge absent just cause." *Lytle*, 579 N.W.2d at 911 (citing *Rood v. Gen. Dynamics Corp.*, 507 N.W.2d 591 (Mich. 1993)).  This contract provision can be either express or implied at law, the Michigan Supreme Court explains, elaborating that there are

> three ways by which a plaintiff can prove such contractual terms: (1) proof of a contractual provision for a definite term of employment or a provision forbidding discharge absent just cause; (2) an express agreement, either written or oral, regarding job security that is clear and unequivocal; or (3) a contractual provision, implied at law, where an employer's policies and procedures instill a legitimate expectation of job security in the employee.

*Lytle*, 579 N.W.2d at 911 (quotation marks and footnotes omitted).

Here, Plaintiff claims that the open door policy is enforceable as an "implied at law" contract provision, explaining that the policy "instill[ed] in Plaintiff a legitimate expectation that Defendant would not retaliate against her for bringing questions and/or concerns to management."  Am. Compl. ¶ 90.

In Michigan, this type of claim is often referred to as a "*Toussaint* legitimate expectations theory" after the decision in *Toussaint v. Blue Cross and Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980).  *See generally Baggs v. Eagle-Picher Indus., Inc.*, 957 F.2d 268, 271–72 (6th Cir. 1992) (discussing *Toussaint* and progeny); Joanna C. Kloet, Comment, *Using Promissory Estoppel to Preserve Traditional Contract Principles and Protect Employee Rights*, 2005 Mich. St. L. Rev. 1235, 1240–45 (2005) (discussing legitimate expectations theory).

The Michigan Supreme Court applies "a two-step inquiry" to evaluate legitimate expectations claims.  *Lytle*, 579 N.W.2d at 911.  "The first step," the court instructs, "is to

-28-

determine, what, if anything, the employer has promised." *Rood*, 507 N.W.2d at 606 (emphasis

omitted). A "promise" is defined as "a manifestation of intention to act or refrain from acting in

a specified way, so made as to justify a promisee in understanding that a commitment has been

made." *Id.* (quoting *Restatement (Second) of Contracts* § 2(1) (1981)). The second step "is to

determine whether the promise is reasonably capable of instilling a legitimate expectation of

just-cause employment in the employer's employees." *Rood*, 507 N.W.2d at 607.

The Michigan Supreme Court observes that "not all policy statements will rise to the

level of a promise." *Id.* Moreover, the court cautions that "only policies and procedures

reasonably related to employee termination are capable of instilling such expectations." *Id.*

Accordingly, "in all claims brought under the legitimate expectations theory of *Toussaint*, the

trial court should examine employer policy statements, concerning employee discharge, if any, to

determine, as a threshold matter, whether such policies are reasonably capable of being

interpreted as promises of just-cause employment." *Id.*

In *Heurtebise v. Reliable Business Computers, Inc.*, 550 N.W.2d 243 (Mich. 1996), for

example, the employee handbook contained disclaimers that its policies did not create a contract

and the employer reserved the right to modify the policies at its sole discretion. *Id.* at 247.

Specifically, the handbook provided:

> [The handbook] Policies will apply to all company employees, and it is each
> employee's responsibility to assure that his/her own conduct is in conformity
> with those Policies. It is important to recognize and clarify that the Policies
> specified herein do not create any employment or personal contract, express or
> implied . . . .
>
> From time to time, the company specifically reserves the right, and may make
> modifications to any or all of the Policies herein, at its sole discretion, and as
> future conditions may warrant.

*Id.*  The Michigan Supreme Court held that these disclaimers "demonstrate[d] that the defendant did not intend to be bound to any provision contained in the handbook."  *Id.*; *see generally Floss v. Ryan's Family Steak Houses, Inc*., 211 F.3d 306, 316 (6th Cir. 2000) ("Where a promisor retains an unlimited right to decide later the nature or extent of his performance, the promise is too indefinite for legal enforcement.  The unlimited choice in effect destroys the promise and makes it merely illusory."  (quoting 1 Samuel Williston, *Contracts* § 43 (3d ed. 1957)).  Accordingly, the court held that terms of the handbook were unenforceable.  *Heurtebise*, 550 N.W.2d at 247.

In *Toussaint*, in contrast, the court held that a reasonable juror could conclude that the employee handbook created an enforceable promise of "just cause" employment because the handbook contained an express "discharge-for-cause-only" policy statement.  292 N.W.2d at 893.  Specifically, the handbook promised "to provide for the administration of fair, consistent and reasonable corrective discipline" and "to release employees for just cause only."  *Id.* (brackets omitted).  The Michigan Supreme Court concluded that "employees could justifiably rely on those expressions."  *Id.*

In this case, Defendant's express policy statement regarding employee discharge — the handbook acknowledgement that Plaintiff signed — contains the same two substantive disclaimers as in *Heurtebise*, providing:

> This handbook is not intended to serve as a written contract of employment and should not be interpreted as such.  In addition, the policies stated herein are subject to revision by United Producers, Inc. at any time.

> By signing this acknowledgement, you indicate that you have received a copy of the Employee Handbook.  You also indicate that you understand that you are employed at will and that either you or United Producers may terminate the employment relationship at any time for any reason.

Def.'s Mot. Ex. 7. The plain language of this policy statement expressly, unambiguously provides that the employment relationship is terminable at the will of either party. It cannot reasonably be interpreted to instill a legitimate expectation of job security in Plaintiff.

This conclusion is not altered by the implicit promise of Defendant's open door policy. That policy expressly "prohibits retaliation against employees who bring a question or concern to management pursuant to this policy." Def.'s Mot. Ex. 4, at 3. Read in isolation, this provision implies that the employment relationship is not terminable "for any reason." The termination cannot be in "retaliation against employees who bring a question or concern to management pursuant to this policy." *Id.*

Read in context, however, the open door policy cannot reasonably be interpreted to confer contractual rights. "An express policy that disclaims any contractual intent," the Michigan Supreme Court instructs, "certainly requires a plaintiff-employee to explain why a case is reasonable and legitimate despite an express disclaimer. While courts should review handbook provisions in their contexts, in most instances express disclaimers of contractual intent will foreclose legitimate-expectation claims, given the difficulty of then proving such reasonable and legitimate expectations." *Lytle*, 579 N.W.2d at 913 n.17.[4]

The handbook expressly disclaims that any of its policies confer contractual rights, negating any reasonable expectation that a contractual provision would be implied at law. Moreover, the handbook expressly reserves Defendant's right to terminate the employment relationship "for any reason" and to revise the handbook policies "at any time." Such promises cannot reasonably instill a legitimate expectation of job security.

---

[4] This is not to suggest that the terms of the open door policy and the acknowledgement do not create some cognitive dissonance. *See generally* Nancy Leong, *Rethinking the Order of Battle in Constitutional Torts: A Reply to John Jeffries*, 105 Nw. U. L. Rev. 969, 973 n.35 (2011) (discussing cognitive dissonance). The open door policy "prohibits retaliation" while the acknowledgement disclaims the enforceability of the terms of the handbook.

As discussed below, Plaintiff could legitimately expect that she would not be retaliated against for bringing a concern to management.  The source of this legitimate expectation, however, is Defendant's whistleblower policy, not the employee handbook.  Defendant is entitled to summary judgment on count two of the complaint.

Against the conclusion that Defendant is entitled to summary judgment on count two, Plaintiff relies on a quotation from *Toussaint* in which the court wrote in dictum: "Employers can make known to their employees that personnel policies are subject to unilateral changes by the employer.  Employees would then have no legitimate expectation that any particular policy will continue to remain in force.  Employees could, however, legitimately expect that policies in force at any given time will be uniformly applied to all."  292 N.W. at 894–85, *quoted in part in* Pl.'s Resp. 21–22.

Plaintiff's reliance on *Toussaint* is misplaced.  The Sixth Circuit explains: "Though *Toussaint* holds that there may be an implied contract that employment may be terminated only for good cause, it does not hold that this may be the case where an express contract makes the term of employment at will.  It is well settled in Michigan that there cannot be an implied contract covering the same subject as an express one."  *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 462 (6th Cir. 1986) (citing *Steele v. Cold Heading Co.*, 336 N.W.2d 1 (1983)).

Here, as noted, the handbook expressly makes the term of employment at-will. Moreover, it provides: "This handbook is not intended to serve as a written contract of employment and should not be interpreted as such."  Given these express terms, this Court is not at liberty to infer that the open door policy creates an implied contract covering the same subject matter as the acknowledgment.

Defendant is entitled to summary judgment on count two of the amended complaint.

C

Count three alleges that "Defendant breached its Whistleblower Policy by retaliating against Plaintiff for reporting illegal and/or dishonest activity."  Compl. ¶ 103.

As the Court explained in its prior opinion, the enforceability of this express whistleblower protection against "adverse employment action such as termination" would, perhaps, be open to question absent the CEO's authorization.  *See Mills v. United Producers*, No. 11–13148–BC, 2012 WL 954640, at *2–3 (E.D. Mich. Mar. 21, 2012).  The provision is, for example, in some tension with the at-will provision in the employee handbook.  Given that the whistleblower policy bears the imprimatur of the CEO, however, it is enforceable not only on its own terms, but on the handbook's terms as well.

To elaborate, the final sentence of the handbook acknowledgement provides: "No representative of United Producers, Inc., other than the CEO, has the authority to enter into an agreement with you that is contrary to the foregoing."  Def.'s Mot. Ex. 7.  Thus, the handbook prospectively limits modifications to the at-will employment relationship.  Only those approved by Defendant's CEO will be enforceable.

The whistleblower policy, however, is expressly authorized by Defendant's CEO, Dennis Bolling.  It bears not only his name, but also his office phone number, his home phone number, and his cell phone number.  Substantively, the whistleblower policy provides:

> A whistleblower, as defined by this policy, is an employee of United Producers Inc. who reports an activity that he/she considers to be illegal or dishonest . . . .
>
> Examples of illegal or dishonest activities are violations of federal, state or local laws; billing for services not performed or for goods not delivered; and other fraudulent financial reporting.
>
> Whistleblower protections are provided in two important areas — confidentiality and against retaliation.  Insofar as possible, the confidentiality of the whistleblower will be maintained. . . .  The Company will not retaliate against a

whistleblower.  This includes, but is not limited to, protection from retaliation in the form of an adverse employment action such as termination.

Pl.'s Resp. Ex. 9.  Enacted in March 2008, Plaintiff signed an acknowledgement of receipt of this policy the following month, two years after she had signed an acknowledgement of receipt of the handbook.

Thus, the whistleblower policy modifies — limits — the agreement memorialized in the handbook.  Defendant agrees that it will maintain the whistleblower's confidentiality and will not retaliate by terminating the whistleblower's employment.   Put differently, Defendant may terminate an employee for any reason, except as retaliation for reporting illegal or dishonest activity.  *See Thomas v. John Deere Corp.*, 517 N.W.2d 265, 267 (Mich. Ct. App. 1994) ("In some employment contracts, employers choose to retain unfettered discretion to terminate an employee's employment when doing so would not violate the law.   In other employment contracts, employers agree to limit their discretion to terminate an employee's employment in some way.  Employers and employees are free to bind themselves as they wish, and 'at-will' and 'just-cause' termination provisions are merely extremes that lie on opposite ends of the continuum of possibilities.").

Plaintiff has introduced sufficient evidence to raise a question of fact regarding whether Defendant breached this policy.  First, both Mr. Emery and Ms. Stump acknowledge that they did not protect Plaintiff's confidentiality — they brought her complaints to the very person she complained about, Mr. Acker.  Emery Dep. 12:25–13:14; Stump Dep. 45:16–23, 46:20–47:15. Moreover, Ms. Stump's statement to Mr. Emery that she wanted to terminate Plaintiff's employment because she was "tired of her lies" provides some evidence that Defendant terminated Plaintiff's employment because of her complaints about Mr. Acker's conduct.  "Her exact words to me," Mr. Emery recounts, "if I'm remembering correctly, was she was tired of the

lies and that if Heather didn't call for three days, show up, that they were going to let her go."

Emery Dep. 22:17–20.  Ms. Stump further instructed Mr. Emery not to contact Plaintiff and not

to inform Plaintiff of the three day no-call no-show rule.  Counsel for Plaintiff inquired:

> Q:  So you left it with Ms. Mills awaiting a call back from you about the answer
>      to the question, correct?
> A:  Yes.
> Q:  And then Ms. Stump tells [you] not to inform Ms. Mills about the three day
>      no-call no-show rule, right?
> A:  She just specifically asked me not to call or talk to Heather for, until Thursday
>      morning.
> Q:  Did Ms. Mills have any reason to believe, based on what you know, that she
>      was being deemed a no-call no-show?
> A:  No.

Emery Dep. 31:14–31:13.   Under the circumstances, a reasonable jury could conclude that

Defendant terminated Plaintiff's employment in retaliation for her complaints regarding Mr.

Acker's conduct.  Defendant is not entitled to summary judgment on count three of the amended

complaint.

Against this conclusion, Defendant argues that Plaintiff cannot enforce the whistleblower

policy because Defendant's CEO did not sign it.  Def.'s Mot. 14.  Defendant writes: "Plaintiff

has no document signed by the CEO – only a document which references the CEO as a person to

contact."  *Id*.  Defendant's argument lacks merit.

Assuming that the handbook and acknowledgement could prospectively limit the manner

that Defendant would contract with Plaintiff,[5] neither requires that future agreements contain a

signature of Defendant's CEO.  Rather, as noted, the acknowledgement simply provides: "No

representative of United Producers, Inc., other than the CEO, has the authority to enter into an

---

[5] As Judge (later Justice) Cardozo once observed, "Those who make a contract may unmake it.  The clause which forbids a change may be changed like any other."  *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 388 (N.Y. 1919).  In accord, the reporter of the *Restatement (Second) of Contracts* observes: "Can the parties, by inserting a no-oral-modification clause effectively permit only written modifications?  The traditional common law answer was that they could not.  Courts reasoned that any prior agreement, including the no-oral-modification clause itself, can be modified by a later agreement."  E. Allan Farnsworth, *Contracts* § 7.6 (4th ed. 2004) (footnote omitted).

agreement with you that is contrary to the foregoing."  Def.'s Mot. Ex. 7.  The whistleblower

policy, as noted, is expressly authorized by Defendant's CEO.  If Defendant had wished to avoid

enforcement of the whistleblower policy, it needed only omit the imprimatur of its CEO from the

policy.  Defendant did not.  Rather, at the conclusion of the policy, Defendant placed not only

the CEO's name, but also his office phone number, his home phone number, and his cell phone

number.

Defendant is not entitled to summary judgment on count three of the amended complaint.

## D

Finally, Defendant moves for partial summary judgment on Plaintiff's damages based on

after-acquired evidence defense.  Def.'s Br. 10.  Defendant asserts that it would have terminated

Plaintiff's employment if it had known that "during the time the Plaintiff was clocked in as

'working,' she was actually spending time clocked in at the health club."  *Id*.

The after-acquired evidence defense limits the damages available in wrongful discharge

cases "where, after termination, it is discovered that the employee has engaged in wrongdoing."

*McKennon v. Nashville Banner Publ'g Co*., 513 U.S. 352, 361 (1995).  The Supreme Court

explains that "as a general rule in cases of this type, neither reinstatement nor front pay is an

appropriate remedy.  It would be both inequitable and pointless to order the reinstatement of

someone the employer would have terminated, and will terminate, in any event and upon lawful

grounds."  *Id*. at 361–62.  The Court further instructs that the award of back pay in such cases

should likewise be limited, explaining: "The beginning point in the trial court's formulation of a

remedy should be calculation of backpay from the date of the unlawful discharge to the date the

new information was discovered.  In determining the appropriate order for relief, the court can

consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party." *Id*. at 362.

Michigan follows *McKennon* for wrongful discharge cases brought under Michigan law. *See, e.g., Grow v. WA Thomas Co*., 601 N.W.2d 426, 433 (Mich. Ct. App. 1999) (collecting cases). "Equitable in nature," the Michigan Court of Appeals explains, "the rule is usually applied in a situation involving termination or another adverse employment action to ensure that an employee does not benefit from the employee's own misconduct or misrepresentation. The rationale of the cases applying the rule is that a plaintiff who was not entitled to the employment in the first place cannot claim economic damages for the loss of it." *Id*. at 434.

In this case, Plaintiff was terminated in April 2011. She was deposed about ten months later. Following her deposition, Defendant "subpoenaed records from the two health clubs she admitted she used during the time she was employed." Def.'s Br. 10. On May 16, 2012, the health clubs responded. *Id*. at 11. "The information they provided," Defendant writes, "proves irrefutably that during the time the Plaintiff was clocked in as 'working,' she was actually spending time clocked in at the health club." *Id*. at 10. In support of this conclusion, Defendant has produced a summary that it compiled comparing the times Plaintiff clocked into work with the times she clocked into work out at the two health clubs. Def.'s Mot. Ex. 3. (Defendant does not produce the underlying evidence used to compile summary.) Defendant further produces an affidavit of Mr. Warner that asserts that if "[Defendant] had been able to prove the Plaintiff's time card fraud prior to April 29, 2012, it would have terminated her immediately." Warner Aff. ¶ 8.

Plaintiff does not contest that the after-acquired evidence doctrine would limit Plaintiff's damages in this case, if Defendant had timely raised the defense and properly established it.

Pl.'s Resp. 23–25.  But, Plaintiff asserts, Defendant did not include the after-acquired evidence defense in its answer.  Consequently, Defendant has waived the defense.  Alternatively, Plaintiff asserts, even if the defense is not waived, it presents an issue of fact to be resolved by a jury. Each argument is addressed in turn.

**1**

Federal Rule of Civil Procedure 8(c) provides that a party responding to a pleading must "state in short and plain terms its defenses to each claim asserted against it."  Fed. R. Civ. P. 8(c); *see generally* 5 Charles Alan Wright et al., *Federal Practice & Procedure* § 1274 ("The general rules of pleading that are applicable to the statement of a claim also govern the statement of affirmative defenses under Federal Rule 8(c).")

"The purpose of Rule 8(c)," the First Circuit explains, "is to give the court and the other parties fair warning that a particular line of defense will be pursued."  *Williams v. Ashland Engineering Co., Inc.*, 45 F.3d 588, 593 (1st Cir. 1995), *abrogated on other grounds by Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 138 (1st Cir. 2000).

"The fair notice pleading requirement is met," the Fifth Circuit elaborates, "if the defendant sufficiently articulated the defense so that the plaintiff was not a victim of unfair surprise."  *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).  Common sense should inform this inquiry:

> In determining whether general, non-specific language in a defendant's answer, as was used here, suffices to preserve an affirmative defense, an inquiring court must examine the totality of the circumstances and make a practical, commonsense assessment about whether Rule 8(c)'s core purpose — to act as a safeguard against surprise and unfair prejudice — has been vindicated.

*Williams*, 45 F.3d at 593; *see also Wyshak v. City Nat'l Bank*, 607 F.2d 824, 827 (9th Cir. 1979) ("The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense.").

In this case, the ninth enumerated affirmative defense in Defendant's answer asserts: "Some or all of Plaintiff's claims are barred by her respective acts, conduct, omissions or negligence and/or the acts, conduct, omissions, or negligence of a third party."  The twelfth enumerated affirmative defense similarly asserts that "Plaintiff's claims are barred by Plaintiff's own conduct, misrepresentation and/or malfeasance."

Thus, in general terms Defendant's answer put Plaintiff on notice that Defendant intended to use Plaintiff's conduct against her.  The answer did not, however, plainly state that Defendant was asserting an after-acquired evidence defense.  Nor did it do so by reasonable implication.  The answer did not, for example, assert that Defendant would have been justified in terminating Plaintiff's employment because of her conduct, much less plausibly put forward a factual basis for that assertion.  *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing plausibility standard); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (same).  Such a broadly cast assertion does not give fair notice of the particular affirmative defense asserted.

A counterfactual proposition makes the point.  Assume, for purposes of illustration, that Defendant's ninth affirmative defense is recast as an affirmative claim for relief — a counterclaim, for example.  It would provide (without any supporting factual allegations) that the Plaintiff is liable "because of [Plaintiff's] respective acts, conduct, omissions or negligence and/or the acts, conduct, omissions, or negligence of a third party."  Such a generalized assertion, with no supporting factual allegations, would not state a claim on which relief could be granted.

Defendant's affirmative defense is cast at the same level of generality — it asserts "Some or all of Plaintiff's claims are barred by her respective acts, conduct, omissions or negligence and/or the acts, conduct, omissions, or negligence of a third party."  Plaintiff is correct that Defendant did not properly plead the after-acquired evidence defense in its answer.

Plaintiff is not correct, however, that Defendant waived the defense.  As this Court has previously explained, the after-acquired evidence defense need not be pleaded at the time an answer is filed as an affirmative defense.  *Spinner v. B & P Process Equip.*, No. 10–13161–BC, 2012 WL 195374, at *2 (E.D. Mich. Jan. 24, 2012).  Rather, as its very name suggests, the after-acquired evidence defense often arises only after the litigation has commenced.  *See Arnold v. City of Dayton*, No. 1:92–cv–562, 1994 WL 904688, at *3 (E.D. Tenn. Mar. 21, 1994).

In this case, for example, the evidence Defendant relies on was uncovered after the case was commenced through the discovery process (specifically, the evidence was discovered through deposing Plaintiff and using the information learned in the deposition to subpoena two health clubs).  Defendant has not waived the after-acquired evidence defense.

But Defendant has also not yet raised it as an affirmative defense in the responsive pleading.  Consequently, the defense remains unavailable at trial until Defendant seeks leave to amend its answer to include the defense and explains why the defense is being timely raised.

Defendant is thus not entitled to partial summary judgment on damages.

**2**

Finally, it should be noted that even if Defendant had properly pled the defense in its answer, Defendant would still not be entitled to partial summary judgment on damages because a genuine issue of fact exists as to whether Defendant would have in fact terminated Plaintiff's employment because of the misconduct.

To support its after-acquired evidence defense, Defendant produces an affidavit of Mr. Warner that asserts that if "[Defendant] had been able to prove the Plaintiff's time card fraud prior to April 29, 2012, it would have terminated her immediately."  Warner Aff. ¶ 8.

This unequivocal position, however, is in some tension with the acknowledgements of Defendants agents, such as Mr. Acker.  For example, in the summer of 2011 Defendant's chief financial officer, Joseph Werstak, requested that Mr. Acker "send any information [he] had pertaining to Heather Mills['] employment" to human resources.  *See* Pl.'s Resp. Ex. 26 (Acker email).  In August 2011, Mr. Acker emailed Defendant's head of human resources, Ms. Martin, and attached a spreadsheet containing "a log of hours that had concerned me for some time."  *Id*.

Mr. Acker explained: "We were well aware of the fact that Heather had been turning in more hours to payroll than she actually worked.  I had reported this to Brad Warner and Debbie Stump."  *Id*.  In other words, Defendant acknowledges that it was "well aware" of Plaintiff's misreporting her hours "for some time."  (Indeed, Mr. Warner himself was aware of it.)  Yet Defendant did not terminate Plaintiff's employment.  A question of fact thus exists as to whether Defendant actually would have "immediately terminated Plaintiff's employment" based on the after-acquired evidence obtained from the health clubs.

Defendant is not entitled to partial summary judgment on damages.  Moreover, unless it seeks leave to amend its answer to add the after-acquired defense, the defense will be unavailable at trial.

## IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment is (ECF No. 30) is **GRANTED IN PART AND DENIED IN PART**.

It is further  **ORDERED** that summary judgment is **GRANTED** to Defendant on counts one and two of the amended complaint.  Summary judgment is **DENIED** to Defendant on count three.  Partial summary judgment is **DENIED** to Defendant on the affirmative defense of after-acquired evidence.

Dated: September 6, 2012

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 6, 2012.

Tracy A. Jacobs
TRACY A. JACOBS

---