UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HEATHER MILLS,

        Plaintiff,

                                                       Case Number 11-13148-BC

v.                                             Honorable Thomas L. Ludington

UNITED PRODUCERS, INC.,

        Defendant.

_____/

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION TO COMPEL
AND FOR SANCTIONS AND DENYING DEFENDANT'S MOTION IN LIMINE**

       This case arises from the conclusion of Plaintiff Heather Mills' employment relationship with Defendant United Producers. Defendant promised its employees that Defendant would not retaliate against employees who report activities that the employees consider "illegal or dishonest." Plaintiff alleges that Defendant broke this promise. Specifically, after Plaintiff reported wrongdoing of a fellow employee, Mr. Acker, Defendant terminated Plaintiff's employment. Defendant agrees that it terminated Plaintiff's employment, but asserts that it did so for reasons wholly unrelated to Plaintiff's complaints about Mr. Acker's conduct. Defendant contends that it terminated Plaintiff's employment because she did not come to work or call in sick for three consecutive days.

       Trial is scheduled to begin October 9, 2012. Presently, two motions are before the Court: Plaintiff's motion to compel and for sanctions (ECF No. 98) and Defendant's motion in limine (ECF No. 103). Both concern evidence of wrongdoing committed by Defendant's employees that Plaintiff did not report at the time, but nevertheless seeks to introduce at trial.

Plaintiff first moves to sanction Defendant for alleged discovery abuses. In the final week of September 2012, Defendant produced seven bankers boxes of documents for Plaintiff's inspection. These documents, it seems, are sought by Plaintiff to discover if Defendant's employees committed other wrongful acts that Plaintiff was not aware of. Plaintiff contends that evidence that she seeks is not in the boxes, concluding that the documents were either withheld or destroyed by Defendant. As relief, Plaintiff requests a default judgment or, alternatively, "that all documents not produced should be taken as established for purposes of the action." Additionally, Plaintiff seeks to compel the production of a laptop computer used by Mr. Acker. Defendant responds that it produced the entirety of its files for Plaintiff's inspection and that discovery has long since closed. For reasons detailed below, Plaintiff's motion will be denied. Briefly, because Plaintiff has not demonstrated Defendant destroyed or refused to produce responsive documents, sanctions are not appropriate. And because the discovery deadline passed nearly five months ago, Plaintiff's request for production of the laptop is not timely.

Next, Defendant moves in limine "to preclude Plaintiff from presenting evidence of alleged improper activities which she did not report during her employment." Defendant contends that this information is irrelevant and unduly prejudicial. Contrary to Defendant's contention, however, this evidence may be relevant. Specifically, other evidence of Mr. Acker's alleged misconduct (defrauding farmers for Defendant's benefit) is relevant to establish that Defendant terminated Plaintiff because it was concerned about her whistleblowing, not her attendance. The larger the amount of revenue Defendant received from Mr. Acker's alleged misconduct, the greater Defendant's incentive to force out a whistleblower like Plaintiff. Thus, while evidence of alleged improper activities that have nothing to do with Plaintiff's complaints will certainly be excluded as irrelevant, the Court cannot categorically preclude Plaintiff from

presenting evidence of alleged improper activities which she did not report during her employment. Similarly, Defendant has not demonstrated that the probative value of this evidence is substantially outweighed by the risk of unfair prejudice. *Figgins v. Advance Am. Cash Advance Ctrs. of Mich.*, 482 F. Supp., 861, 865 (E.D. Mich. 2007) (Lawson, J.) (discussing the "practical difficulty in ruling on such motions is the absence of context"). Defendant's motion will be denied.

**I**

**A**

A middleman in the livestock industry, Defendant's business model is not particularly complicated, so far as the allegations in this case are concerned. Farmers present their cattle to Defendant. It inspects the cattle and sorts them into three categories. Healthy cows are accepted. Unhealthy cows are not. Cows of questionable health are conditionally accepted. Defendant promptly pays farmers for the healthy cows, but does not pay for the cows of questionable health. Defendant then sends the cows to the slaughterhouse, where a U.S. Department of Agriculture veterinarian inspects each cow. If the cow is deemed fit for human consumption, the slaughterhouse pays Defendant. If the cow is condemned, the slaughterhouse does not. Defendant, in turn, then pays the farmer for the conditionally accepted cows that have passed inspection. At least that is how the business is supposed to operate.

One of Defendant's managers, Scott Acker, decided to alter the operations to reduce Defendant's risk at the farmers' expense. He did so by altering U.S.D.A. condemnation slips. When a cow that Defendant had unconditionally accepted as healthy was condemned by the U.S.D.A., Mr. Acker would white out its tag number on the condemnation slip. In its place, he would insert the tag number of a conditionally accepted cow that had passed inspection,

misrepresenting that the conditionally accepted cow had been condemned.  Mr. Acker then gave the altered slips to Plaintiff to mail to the farmers.

**B**

In 2009, Plaintiff discovered what Mr. Acker was doing.  Asked in her deposition to detail what she discovered, Plaintiff responded: "When the condemnation slips would come in with the kill sheets, animals that had passed inspection, Scott was not paying the farmers back. He was changing tag numbers on the condemnation slips and telling farmers that their stock had been condemned when, in fact, it had not been."  Pl. Dep. 21:1–6.  "It was random at first," Plaintiff recalls, "and in 2010 it became much more significant."  Pl. Dep. 21:14–15.  Asked how many times she found Mr. Acker altering the condemnation slips, Plaintiff responded: "Eight, ten."  Pl. Dep. 23:19.

Plaintiff first brought the matter to Mr. Emery.  "I showed him the condemnation slip and asked him why does this not match up to the kill sheet," Plaintiff recalls.  Pl. Dep. 23:1–2.  She further expressed concern "[t]hat this animal has, in fact, been paid for, it did pass inspection, and I have a payout sheet that shows I am to send a letter to the farmer stating that this animal has been condemned."  Pl. Dep. 23:2–5.  Mr. Emery "said he would look into it."  Pl. Dep. 23:7.

Plaintiff also brought the matter to Ms. Stump, recalling: "That would have been in the fall of 2009.  It would have been also during 2010. . . .  I told her that I had concerns . . . .  And I did not — did not feel that it was right to send farmers letters that their stock had been condemned when it had not been, and I refused to do so."  Pl. Dep. 24:1–11.

Both Mr. Emery and Ms. Stump confirm that Plaintiff brought her concerns to them. Emery Dep. 10: 12–20; Stump Dep. 31:1–4.  Mr. Emery investigated the issue by speaking with Mr. Acker.  Emery Dep. 12:25–13:14.  Based on the conversation, Mr. Emery concluded that

-4-

Mr. Acker was not altering condemnation sheets.  Emery Dep.13:11–14.  Mr. Emery did not investigate further.

Ms. Stump conducted essentially the same investigation — she spoke to Mr. Acker. When Ms. Stump was asked in her deposition "did you do anything to investigate at all?" she responded: "To the best that I can recall, I did speak with [Mr. Acker] . . . .  But honestly, I don't remember the conversation much other than that."  Stump Dep. 34:7–13.  In her deposition, Ms. Stump was asked, "So basically your investigation of Mr. Acker was a phone call to him in which you can't really recall what was said, true?"  Stump Dep. 36:2–4.  "True," Ms. Stump responded.  Stump Dep. 36:5.

Mr. Acker denies that either Ms. Stump or Mr. Emery spoke with him about Plaintiff's concerns, asserting "I did not hear anything about it."  Acker Dep. 58:9–10.

C

In the fall of 2010, Plaintiff again took issue with Mr. Acker's accounting practices. Specifically, she objected that Mr. Acker was "trying to recoup fees from farmers [for condemned cattle] without them being aware of it."  Pl. Dep. 25:1–2.  She explains that "when I went into the folder to get the payouts for that week, I noticed that . . . there were a series of farmers' names that were on this list at two different sides, and he was deducting either trucking or dead stock fees from farms without them knowing it."  Pl. Dep. 11:16–23.  Discussing a spreadsheet that Mr. Acker created to keep track of the costs that he sought to pass on to the farmers, Plaintiff elaborates:

> This is a — what Scott has done is he's generated a list of the farm names and associated fees.  It would either be a dead stock or a condemnation fee that was assessed from the kill floor or the packing house at the time that the animal was processed.  He wrote down a dollar amount or value associated with what was taken out of the check that was received from the animals being slaughtered. . . .

> The slaughter facility would send a net check with all these fees taken out of it for the condemnations or the debts. Scott would then transfer it to a handwritten sheet of paper, keeping track of what farms were assessed fees. And on subsequent check when they would bring in cattle, he would then increase the deduct amount to try and recoup the fees that [Defendant] was assessed for their dead stock or condemned animals, not telling the farmer that he was, in fact, charging them and passing along that fee.

Pl. Dep. 119:17–120:10. On discovering Mr. Acker's spreadsheet, Plaintiff recalls, "I made a copy of the sheet. I immediately went into Craig Emery's office and showed [it] to him." Pl. Dep. 12:1–2.

Mr. Emery confirms that Plaintiff brought the matter to his attention, reporting: "I saw a list with farmers' names, various amounts." Emery Dep. 11:18–19. Again, Mr. Emery investigated by talking to Mr. Acker. Emery Dep. 11:21–12:1. Mr. Acker explained to Mr. Emery that Defendant is "charged X amount if you have a dead animal on a truck and you get charged 40, 50 dollars trucking even though it's dead. So if that cow didn't pass inspection, there's no way for us to recover those funds. [And so Mr. Acker] just did it on a later cow." Emery Dep. 11:21–12:1. Mr. Emery concluded that Mr. Acker's actions were "appropriate." Emery Dep. 12:4–10.

Plaintiff also reported her concerns to Ms. Stump. "Again," Plaintiff recalls, Ms. Stump said "she would look into it." Pl. Dep. 25:13. Again, Ms. Stump recalls that she spoke with Mr. Acker. Stump Dep. 34:6–13. And again, Ms. Stump explained in her deposition, "honestly, I don't remember the conversation." Stump Dep. 34:6–13.

## D

In April 2011, Plaintiff vacationed in Florida with Mr. Schenk. Pl. Dep. 80:5–9. Plaintiff recalls that Ms. Stump "called on the way to the airport. . . . I gave her an estimated time when we would be returning. Because we were driving home, I did not know what the weather

conditions would be, but told her that I would be back by the 1st of May." Pl. Dep. 81:20, 82:4–

7.

      Over the next two weeks, Plaintiff made several calls to the office, recalling: "I would

always check in with Samantha [Jensen, the office assistant,] to see how things were going." Pl.

Dep. 93:9–14. On Monday, April 25, Plaintiff again called the office. She recounts:

> I spoke with [Mr. Emery] . . . . I told him that [Mr. Schenk] did not want to leave
> to drive back from Florida yet because it was still fairly cold here in Michigan,
> and had asked him if it was going to be a problem if I was going to be back later
> than the 1st of May. I told him that I thought that I would be out of vacation time,
> but was not sure. That I was okay if I did not get paid for a couple days, but I did
> not know what the requirements were, if I were going to be off, you know,
> without receiving pay, so that's what I had asked him, if he could check into that
> for me . . . .
>
> [I] asked him if I were to take this position [with Mr. Schenk] what would the
> requirements be, because before I had went down, I had asked him to talk to [Ms.
> Stump] to see if it would be possible for me to stay on even as a part-time
> employee . . . . And if I was going to be, you know, leaving employment, for two
> weeks['] notice.

Pl. Dep. 83:5–6, 83:20–84:5, 84:8–15. Counsel for Defendant inquired "And what did [Mr.

Emery] say when you said 'Would it be a problem if I didn't get back later than the 1st of May?'

" Pl. Dep. 84:16–17. "He said 'Don't worry about it. Have fun. Enjoy the weather. It's much

warmer down there than it is here." Pl. Dep. 84:18–19.

      Mr. Emery recalls the conversation differently. "Heather had called me on, I think it was

a Monday when she couldn't make it back and she asked me, 'Am I just done or do I have to

give two weeks' notice?' And I said, 'I don't know, but I can call and find out.'" Emery Dep.

23:4–8. Mr. Emery further recalls that he called Ms. Stump the next day and relayed Plaintiff's

questions. Emery Dep. 23:10. "I don't know, but I'll find out," Ms. Stump told Mr. Emery.

Emery Dep. 23:10.

Ms. Stump recalls that after speaking with Mr. Emery, she called Plaintiff on both Tuesday, April 26, and Wednesday, April 27.  Stump Dep. 18:17–18.  (Plaintiff denies that Ms. Stump called either day.  Pl. Dep. 82:15–19.)

On April 28, Ms. Stump and called Plaintiff and notified her that her employment had been terminated.  That day, Defendants also mailed a registered letter to Plaintiff's home.  Post-dated April 29, the letter provided: "As of this date, you have been absent from work since Monday, April 25, 2011.  Because your absence has not been approved and we have not heard from you, we have determined that you have abandoned your position.  In accordance with our policy on job abandonment, we are terminating your employment."

**E**

In July 2011, Plaintiff brought suit against Defendant in this Court.  Discovery proved contentious, and several motions to compel were filed.  *See* ECF Nos.  26, 33, 38, 98.  Discovery closed on May 15, 2012.  ECF No. 11.  Motions in limine were due by August 14, 2012.  *Id.*

On September 21, 2012, Magistrate Judge Charles Binder granted in part and denied in part Plaintiff's renewed motion to compel.  ECF Nos. 95.  "The parties are encouraged to engage in a mutual inspection of documents," the order provided, presciently cautioning that if the parties were unable to agree on a mutual inspection, Judge Binder would revisit the issue on September 24.  The parties were unable to agree.  Accordingly, on September 24, Judge Binder ordered Defendant to "produce at its office the referenced Bankers Boxes of documents by the close of business today, September 24, 2012. . . .  No later than noon Friday, September 28, 2012, Plaintiff may file any pleadings relating to document discovery"  ECF No. 96.

On September 28, Plaintiff filed her motion to compel and for sanctions.   On October 4, 2012, Defendant filed its motion in limine.  Each is addressed in turn.

-8-

**III**

**A**

Rule 37 provides that if a party "fails to obey an order to provide or permit discovery . . .

the court where the action is pending may issue further just orders."  Fed. R. Civ. P. 37(b)(2)(A).

Among the enumerated "just orders" are those "directing that the matters embraced in the order

or other designated facts be taken as established for purposes of the action, as the prevailing

party claims" and those "rendering a default judgment against the disobedient party."  *Id.*

"With a rule as flexible as Rule 37," Wright and Miller report, "inevitably a broad

discretion must be given the trial judge with regard to sanctions."  8B Charles Alan Wright et al.,

*Federal Practice and Procedure* § 2284 (3d ed. 2010); *e.g.*, *Nat'l Hockey League v. Metro.

Hockey Club, Inc.*, 427 U.S. 639, 642 (1976) (noting sanctions discretionary); *Bass v. Jostens,

Inc.*, 71 F.3d 237, 241 (6th Cir. 1995) (same).

In evaluating whether to impose a sanction of entering judgment against a party, the Sixth

Circuit instructs, the district court should consider four factors:

> The first factor is whether the party's failure to cooperate in discovery is due to
> willfulness, bad faith, or fault; the second factor is whether the adversary was
> prejudiced by the [opposing] party's failure to cooperate in discovery; the third
> factor is whether the [opposing] party was warned that failure to cooperate
> could lead to [the entry of judgment against it]; and the fourth factor is whether less
> drastic sanctions were imposed or considered before dismissal was ordered.

*Bass*, 71 F.3d at 241 (citing *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir.

1990)).  The burden of proof is on the party moving for sanctions.  *See Wade v. Soo Line R.R.

Corp.*, 500 F.3d 559, 564 (7th Cir. 2007) (noting that Rule 37 sanctions require proof by a

preponderance of the evidence rather than clear and convincing evidence).

In this case, none of these factors support Plaintiff's motion for sanctions.  Plaintiff

writes:  "Although Defendant claims that all responsive documents are contained in these banker

boxes, this is factually false and cannot be proven by the Defendant." Pl.'s Mot. for Sanctions 18. As noted, however, it is not Defendant's responsibility to prove that sanctions are inappropriate. Rather, Plaintiff bears the burden of proving that sanctions are appropriate. She does not carry this burden. She does not demonstrate willfulness, bad faith, or fault on the part of Defendant. Rather, Plaintiff acknowledges that Defendant produced seven bankers boxes and represented that "all responsive documents are contained in these banker boxes." *Id*. For the same reason, Plaintiff has not demonstrated that Defendant has not cooperated. Rather, Defendant produced responsive documents in January 2012, supplemented its responses in May 2012, and in September 2012 produced the entirety of its files for Plaintiff's inspection. Sanctions are not appropriate.

Additionally, Plaintiff seeks "an order compelling the production of the computer utilized by Mr. Acker." *Id*. ¶ 28. Discovery, as noted, closed nearly five months ago. This request is not timely made. Plaintiff's motion will be denied.

**B**

Under the Federal Rules of Evidence, relevant evidence is presumptively admissible. Fed. R. Evid. 402. Evidence is relevant when: "(a) it has a tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Relevancy is a de minimus requirement — evidence is presumptively admissible if it has even the "slightest probative worth." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir.2009); *United States v. Whittington*, 455 F.3d 736, 739 (6th Cir.2006); *Douglass v. Eaton Corp.*, 956 F.2d 1339, 1344 (6th Cir.1992) (noting the standard is "extremely liberal").

Relevant evidence may nevertheless be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

On October 4, 2012, Defendant filed its motion in limine. As noted, all motions in limine were required to be filed by August 14. Defendant's motion is not timely.

Even if it were, Defendant would nevertheless not be entitled to the relief it seeks. Defendant seeks to "to preclude Plaintiff from presenting evidence of alleged improper activities which she did not report during her employment." Def.'s Mot. in Limine 1. Defendant contends that the evidence is irrelevant because "all that is relevant is what the Plaintiff allegedly reported under the whistleblower policy, to whom she reported it, when she reported it, and finally, was she terminated because of the report(s)." *Id*. at 3. Additionally, Defendant argues, the evidence is unfairly prejudicial, explaining: "There is only one reason that the Plaintiff wants to introduce this evidence. The Plaintiff wants to paint Defendant as 'bad people,' and is attempting to inflame the jury by improper prejudice and a desire to punish." *Id*. at 5.

Contrary to Defendant's contention, the evidence is relevant. Specifically, it is relevant to establishing that Defendant terminated Plaintiff because of her whistleblowing, not her attendance. As noted, Plaintiff contends that she complained that Mr. Acker was defrauding farmers to benefit Defendant. The larger the revenue Defendant received from Mr. Acker's alleged misconduct, the greater Defendant's incentive to force out a whistleblower like Plaintiff. With each additional "net transaction" of Mr. Acker, it becomes marginally more likely that Plaintiff was forced out because of her whistleblower. If Mr. Acker's actions were netting Defendant $300,000 each year, for example, Defendant would have a greater incentive to force

Plaintiff out than Mr. Acker's actions were netting only $3,000 each year.  This evidence is relevant.

In passing, it should be noted that evidence of alleged improper activities that have nothing to do with Plaintiff's complaints does not carry a similar probative value.  Evidence that Defendant did not pay the proper amount of property taxes due on its corporate headquarters, for example, is certainly irrelevant.  Nevertheless, the Court cannot categorically preclude Plaintiff from presenting evidence of alleged improper activities by Mr. Acker which she did not report during her employment.

Moreover, Defendant has not demonstrated the probative value of this evidence is substantially outweighed by the risk of unfair prejudice.  Although Defendant is correct that there is certainly some risk of unfair prejudice, Defendant is not correct that the only evidentiary value to the evidence is "to paint Defendant as 'bad people.'"  Def.'s Mot. 5.  As discussed above, the evidence may also be used to establish that Defendant terminated Plaintiff because of her whistleblowing.

Defendant's motion will be denied.  The Court cautions, however, that this does not bar Defendant from objecting to this evidence for the reasons listed in Rule 403.

## IV

Accordingly, it is **ORDERED** that Plaintiff's motion to compel and for sanctions is (ECF No. 98) is **DENIED**.

It is further  **ORDERED** that Defendant's motion in limine is **DENIED**.


Dated: October 5, 2012

                                        s/Thomas L. Ludington
                                        THOMAS L. LUDINGTON
                                        United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 5, 2012.

Amanda Chubb for Tracy A. Jacobs
TRACY A. JACOBS